IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

IN RE SEARCH OF:   XXXXXXX XXXX,   )           Case No.:
XXXXX, XX WASHINGTON, DC            )

    Your affiant, Warren Buckley, being duly sworn, does depose and state that:

**I.      Introduction**

    1.      I am a Special Agent with the United States Secret Service (USSS), Department of Homeland Security. I have been so employed by the USSS since September 2, 2007 and have been assigned to the Washington Field Office throughout this time period. During this time period, I have participated in numerous financial fraud-related investigations.

    2.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 3056 of Title 18, United States Code.

    3.      I am currently assigned to the Maryland Investigative Team, which is a squad charged with investigating federal laws, including violations of 18 U.S.C. § 1029, in the Washington, DC, metropolitan area.

    4.      I have received formal training in the investigation of financial crimes, including access device fraud, the counterfeiting of United States monetary obligations and securities, and identity theft at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the USSS's James J. Rowley Training Center in Beltsville, Maryland. During my tenure, I have

investigated cases involving check fraud and access device fraud. Prior to September 2007, I was employed as a Federal government contractor serving the Departments of Justice and Homeland Security working in the asset forfeiture and immigration enforcement arenas.

5. This affidavit is made in support of an application for a search warrant to search the property located at **XXXXXXXXXX, XXXXX, XXXXX, Washington DC**, further described in Attachment A hereto, for the items described in Attachment B hereto.

6. Based on evidence gathered thus far in my investigation, I submit that there is probable cause to believe that, contained within **XXXXXXX, XXXXX, XXXXXXX, Washington DC**, there are evidence, instrumentalities, and fruits of crimes related to violations of Title 18, United States Code, Section 1029 (access device fraud), Title 18, United States Code, Section 2314 (transportation of stolen goods), and Title 18 United States Code, Section 2315 (receipt of stolen goods).

7. The facts and information contained herein are based upon my personal knowledge and observations made during the course of these investigations, information conveyed to me by other law enforcement officials and my review of records, documents and other evidence obtained during this investigation. This affidavit does not contain all of the information known to me regarding the targets of the investigation. Instead, I have included in this affidavit facts which I believe are sufficient to support a probable cause finding for the issuance of the requested search and seizure warrant.

**II.   Details of Probable Cause**

8. I have been conducting an investigation into an access device fraud scheme in which the perpetrators use credit card numbers belonging to other people, without the permission of those other people, to purchase items from retailers in the Washington DC metro area. The

retailers include Spicher's Appliances, Inc., Reeds Jewelers, Inc., The Home Depot, Inc., and Lowe's Companies, Inc. and the items purchased include electronics, jewelry, construction and home renovation items such as hardwood flooring, washer and dryer machines, refrigerators, dishwashers, stoves, cooking grills, microwaves, and other construction equipment and materials.

9. The orders for these items are placed over the phone. On February 9, 2009, a confidential informant (CI) pleaded guilty in the Eastern District of Virginia to receiving property which had been unlawfully converted. The CI has been debriefed and told me that his supplier of the fraudulently purchased goods used the telephone numbers XXX-XXX-XXX and XXX-XXX-XXXX to contact him. This information was corroborated by a review of the CI's phone records, a review of both target phone numbers' records, and by the records of several retailers which indicated fraudulent orders placed by these phone numbers. The target phone numbers' records indicated that the phones used to place the orders were disposable, prepaid phones.

10. Records for telephone number XXX-XXX-XXXX showed that several calls had been placed in repeating pattern to the businesses Spicher's Appliances, located in Hagerstown, MD, and We Help U Move, located in Frederick, MD.

11. In February 2009, I telephonically interviewed We Help U Move employee, identified by the initials G.C., regarding telephone number XXX-XXX-XXXX, and inquired if he had performed any moving services at home improvement stores. G.C. confirmed that during the month of September 2008, he had performed pick ups and deliveries from Spicher's Appliances for an individual calling himself "John Wilson." Upon conferring with Spicher's, G.C. later learned that Wilson was involved in a scheme using stolen credit card information.

12. G.C. provided records for, among other things, two moves he had done at the request of Wilson:

    (a)    on September 15, 2008, We Help U Move picked up two LCD flat screen televisions, 52" and 46" in size, from Spicher's Appliances in Hagerstown, Maryland. Records from Spicher's indicate that these two televisions, SKUs KDL46Z4100S and KDL52XBR4, were purchased for $5,403.88 and paid for by MasterCard credit card number xxxxxxxxxxxx9456. MasterCard fraud investigators have determined this purchase to have been made fraudulently.

    (b)    on September 16, 2008, We Help U Move picked up three plasma televisions, all 50" in size, from Spicher's Appliances in Hagerstown, Maryland. Records from Spicher's indicate that these three televisions, SKUs TH-50PZ80U (2) and TH-50PZ85UJ (1), were purchased for $5,349.82 and paid for by MasterCard card number xxxxxxxxxxxx9456. MasterCard fraud investigators determined this purchase to have been made fraudulently.

    13.    Regarding the delivery of the purchases, G.C. stated that Wilson provided the delivery address as XXXX XXXXX XX., XX, Washington, DC, a single-family residence. However, upon delivery, a man appeared on foot from a nearby alley and guided G.C. to the rear of an apartment building located one block away. Carroll later identified this apartment building as the rear of XXXX XXXX XX., XX, Washington, DC. G.C. stated that the individual would then unlock the padlocked gate and have Carroll deliver the merchandise to the rear yard of the apartment building. G.C. said that the individual receiving the merchandise was reluctant to sign for the deliveries, but eventually did so when G.C. threatened not to deliver the items. The man signed for deliveries on 9/15/08 and 9/16/08 as "J. Wilson" and "JW." G.C. described the man signing for the deliveries as a dark-complexioned black male of slim build with short black hair standing about 5'5" tall, approximately 35 years of old.

14. On February 19, 2009, I interviewed the individual who owns XXXX XXXX XX., XX, Washington, DC, indentified by the initials W.S. W.S. advised that all tenants have a key to the rear yard fence but that Robert Bland, who stayed in Unit #4, was the only male tenant in the four-unit property. W.S. described Bland as a dark-complexioned black male of slim build with short black hair standing about 5'3" tall. Rental application documents showed Bland as a 42 years old male with no occupation or source of income, and who has resided at that address since August 2005. W.S. said he believed Bland is still unemployed. W.S. also stated that he had been inside Bland's residence in late January 2009 and noticed an extremely large flat screen television in the living room. W.S. did not know the exact size of the television, but said it was significantly larger than his own 40" television. W.S. said he also could hear a second television in Bland's bedroom.

15. On March 5, 2009, G.C. and another employee who delivered to the rear of XXXX XXXX XX., XX, Washington, DC, independently identified Bland from a photographic array as the man to whom they delivered merchandise on multiple occasions, and who signed for the items as "J. Wilson."

16. On March 5, 2009, I interviewed Spicher's Appliances salesperson, identified as J.S., who took phone order purchases for Wilson. J.S. said Wilson first called seeking washer and dryer machines. J.S. said Wilson provided his callback numbers as XXX-XXX-XXXX and XXX-XXX-XXX. J.S. said Wilson later called back seeking televisions, after he said he had noticed them on Spicher's Web site. Wilson then proceeded to call back several times over the next few days requesting multiple televisions, saying they were for various family members.

17. J.S. and Spicher's bookkeeper provided records for all purchases made at their store by Wilson. Including the aforementioned television purchases, records show that Wilson

fraudulently charged a total of $17,539.82 to MasterCard credit card number xxxxxxxxxx9456. Other items purchased by Wilson include multiple washers and dryers, a gas stove, refrigerator, microwave and dishwasher.

18. I know that these types of crimes are ongoing in nature, and the perpetrators will engage in this activity on a continuing basis. I also know these suspects will often keep evidence, such as fraudulent identification cards, receipts and stolen credit cards in their residences or vehicles for months, even though this property is incriminating. I also know that it is common for a perpetrator of such a crime to keep the information of such a crime on hand for further use in acquiring fraudulent credit in the name of the victim. I am aware that the names of other victims may be found since perpetrators of this type of crime "churn" or go through several victims. This is done because a financial institution may discontinue the credit on a particular victim when it discovers fraudulent activity. The perpetrator of the crime is then forced to acquire other fraudulent account information in the names of other victims. Suspects may keep this information on hand for months, because it may be used again at a later date or sold to other suspects. I am aware of cases in which suspects have kept information on stolen or fraudulent accounts for over one year.

19. I also know that those involved in fraudulent activities commonly maintain addresses or telephone numbers in books, on papers and computers/electronic media which reflect names, addresses and/or telephone numbers of their associates.

20. I also know that those involved in access-device fraud use electronic devices commonly referred to as "skimmers." These devices can fit in the palm of a hand and utilize a magnetic strip reader which captures and records the data contained on a credit card's magnetic strip such as the account holder's name, credit card number and other security features. This data can then be downloaded onto a computer where the data can be viewed, printed, transmitted

electronically to another location or otherwise manipulated.  The data can also be uploaded onto a blank credit card's magnetic strip with a magnetic strip writer.  The new card can then be used in the same fashion as the original.

21.     I also know that it is common for persons involved in fraud schemes to store information pertaining to access device and fraud schemes on computer equipment and electronic storage media including but not limited to computer hard drives, diskettes, tapes and other media capable of storing information in a form readable by computer.  This information includes formats for fraudulent identification documents, and letters issued to financial institutions.

22.     In addition, based on my training and experience, and on consultation with other agents familiar with the investigation of fraudulent schemes, I am aware that the types of records described herein above are often maintained in both hard copy and electronic media formats, such as computers and personal digital assistants ("PDA's"). Based on my knowledge, training, and experience and consultation with other Federal Law Enforcement Officers, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) The objects themselves may be instrumentalities, fruits, or evidence of crime and/or (2) The objects may have been used to collect and store information about crimes (in the form of electronic data).

23.     Based on my training, experience, and consultation with other Federal Law Enforcement Officers, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or otherwise controlled environment. This is true because of the following:

   a.   The volume of evidence. Computer storage devices (like hard drives, diskettes, tapes, laser disks, cd's) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all stored data to determine which particular files are evidence of a crime. This sorting process can take days or weeks, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

   b.   Technical requirements. Searching computers for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and

applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction, a controlled environment is essential to its complete and accurate analysis.

24.     Upon securing the computers so that no information contained therein can be changed, altered, damaged or corrupted, a computer examiner will attempt to create an electronic image of those parts of the computer that are likely to store evidence of documents and information described in this affidavit. In order to determine whether the computer contains any information within the scope of the warrant, it will be necessary to examine the programs and file names saved in the computer's memory, much the way file folders would be reviewed during the execution of a search warrant to determine if the files are within the scope of the search warrant. After inspecting the computer systems, our computer analysts may determine it is not feasible to electronically image the necessary data on site, due to any of the circumstances described above, and the computer systems and related peripherals may have to be seized and removed from the premises, so that the data can be retrieved and preserved in a laboratory or other controlled environment. If, after inspecting the computer systems, the analyst(s) determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

25.     Any of the items described above, may be stored by the targets of the investigation in the form of magnetic or electronic coding on computer media or media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks and drives, or removable hard disk cartridges. The search procedure of the electronic data contained in computer operating software or memory devices, whether performed on site or in a laboratory, or other controlled environment, may include the following techniques:

      a.      surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the markings it contains, and opening a drawer believed to contain pertinent files.)

      b.      "opening" or cursory reading the first few "pages" of such files in order to determine their precise contents;

      c.      "scanning" storage areas to discover and possibly recover recently deleted data;

      d.      scanning storage areas for deliberately hidden data or files;

      e.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

26.      Based on my training and experience, I also know that those involved in access-device fraud may create or possess false and/or fraudulent identification documents to support their fraudulent access-device usage. I also know that, in order to support their access-device scheme, they may possess equipment for producing false and/or fraudulent identification documents, credit cards, debit cards, and stored-value cards.

27.      Based on my training and experience, I also know that those involved in access-device fraud may use personal data obtained from stolen credit card numbers to access financial records of the original cardholders, including credit reports, bank statements, and credit card account information.

28.      Based on my training and experience, I also know that those involved in access-device fraud often set up financial relationships with banks, businesses, and other individuals to dispose of, transfer, or hide the proceeds of the access-device fraud. Records of these transactions include, but are not limited to, wire transfers receipts, bank statements, check books and registers, bank checks and receipts, and money order and/or cashier's checks and receipts. I also know that those involved in financial crimes often use safes or lock boxes to store documents and sensitive information related to the fraud.

29.     Based on my training and experience, I also know that co-conspirators involved in access-device fraud use cellular telephones, answering machines, pagers, and/or fax machines to contact one another for purposes of conducting activities related to the conspiracy.

30.     Based on the foregoing facts and circumstances, I believe probable cause exists to search the premises located at **XXXX XXXX XXXX XXXXX, XX, Washington, DC**, in order to recover and identify instrumentalities, evidence, and fruits of criminal acts related to the fraudulent use and illegal production of credit cards, as described above.  I believe the search would reveal fruits, evidence, and instrumentalities of access device fraud and conspiracy to commit such fraud.  I hereby make application that a search and seizure warrant be issued authorizing me, with the necessary and proper assistants, to search the identified premises.

                                                              Warren Buckley
                                                              Special Agent, USSS

Subscribed and sworn before me this ____ day of April, 2009

_____
Honorable Chief Judge Royce C. Lamberth
United States District Court